UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

AGRAKEY SOLUTIONS, LLC AND
JOHN REITSMA,

                    Plaintiffs,

      v.

MID-CONTINENT CASUALTY
COMPANY,

                 Defendant.

Case No. 1:10-cv-00570-S-EJL

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

The Court has before it plaintiff AgraKey Solutions, LLC and John Reitsma's

motion for summary judgment (Dkt. 19).  The Court has determined oral argument would

not significantly assist the decisional process and will decide the motion without a

hearing.  For the reasons expressed below, the Court will deny the motion.

## FACTS

This is an insurance policy coverage dispute.  AgraKey bought general commercial

liability insurance from Mid-Continent Casualty Company.  The policy included coverage

for "advertising or personal injury."

During the effective date of the policy, third party BioMagic, Inc. commenced arbitration proceedings against AgraKey, individual defendant John Reitsma, and Dutch Brothers Enterprises, LLC.  AgraKey[1] contends that BioMagic sought redress for "personal or advertising injury" in that arbitration and, therefore, believes Mid-Continent was obligated to provide a defense.

The BioMagic arbitration concerns a license dispute between BioMagic, on the one hand, and Dutch Brothers, AgraKey, and Reitsma, on the other hand.  *See Demand for Arbitration,* Dkt. 26-1.  In its arbitration demand, BioMagic alleges that these parties breached a December 2005 license agreement.

Under that agreement, BioMagic granted Dutch Brothers an exclusive license to manufacture, market, and sell BioMagic's "proprietary bio-stimulant products, accessories, and supplies in 'agriculture and agriculturally related applications in North America, including Hawaii." Dkt. 26-1 at 5.  In 2007, BioMagic consented to Dutch Brothers' transfer of its rights under the license agreement to Reitsma, individually.  *See May 7, 2007 License Transfer Agmt.,* Dkt. 26-1.  Reitsma then formed a new company – AgraKey – to perform the marketing and sales functions under the license agreement, while Dutch Brothers continued to manufacture the product.

In hindsight, BioMagic believed AgraKey saw this transfer agreement as a means to avoid paying royalty payments due under the original license agreement.  *See* Dkt. 26-1, at 5-6.

---

[1] For ease of reference, the Court sometimes refers to all respondents in the BioMagic arbitration as "AgraKey."

BioMagic alleges that beginning in early 2009, AgraKey and Dutch Brothers materially breached the license agreement by marketing and selling BioMagic's "proprietary products" to businesses not involved in agriculture.  Dkt. 26-1, at 6. BioMagic also claimed that AgraKey and Dutch Brothers failed to pay royalties for the first three quarters of 2009.  BioMagic indicated that it would elect to terminate the license agreement unless these breaches were cured.  AgraKey and Dutch Brothers responded that they wanted to terminate the license agreement anyway.  As a result, the license agreement terminated effective November 2, 2009.

On November 13, 2009, BioMagic filed its arbitration demand, summarizing its complaint as follows:  "By continuing to manufacture, market, and sell Claimant's proprietary products after termination of the License Agreement and to companies outside the scope of their licensing rights, Respondents are intentionally misappropriating Claimant's property, engaging in unfair competition, and intentionally interfering with Claimant's prospective business relationships."  Dkt. 26-1, at 7.

Roughly six months after commencing the arbitration, BioMagic moved for injunctive relief.  *See* Dkt. 26-2.  In that motion, BioMagic contended that defendants' continued manufacture and sale of the products was "creating confusion in the marketplace as to who actually owns the proprietary rights of BioMagic's products." Dkt. 26-1 at 10:22-24; *see also Watt Dec.*, Dkt. 26-3; *Mobley Dec.*, Dkt. 26-4.

Shortly after BioMagic filed its motion for injunctive relief, AgraKey tendered defense of the BioMagic arbitration to Mid-Continent.  *See June 22, 2010 Letter*, Dkt. 26-

9.  After some back and forth between the insurance company and its insured, Mid-Continent denied coverage.  *See Oct. 4, 2010 Letter*, Dkt. 26-17.

Meanwhile, the arbitration proceedings continued and in February 2011, the arbitrator entered its final award in favor of BioMagic.  After the arbitrator entered this award, AgraKey pressed the coverage issue, attempting to convince Mid-Continent to reconsider its decision to deny coverage.  Mid-Continent again denied coverage and, shortly thereafter, AgraKey and Reitsma filed this suit.

## THE LEGAL STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

The party moving for summary judgment has the initial burden of showing there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).  Material facts are those

necessary to the proof or defense of a claim, and are determined by reference to substantive law.  *Id.* at 248.  A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Once the moving party has met its initial burden, the nonmoving party has the burden of presenting evidence to show that a genuine issue of fact remains. The party opposing the motion for summary judgment may not rest upon the mere allegations or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial.  *Id*. at 248.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" then summary judgment is proper as "there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).[2]

In applying the above standard, the Court must view the evidence in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.

---

[2]  See also Rule 56(e) which provides:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    (1)     give an opportunity to properly support or address the fact;
    (2)     consider the fact undisputed for purposes of the motion;
    (3)     grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it; or
    (4)     issue any other appropriate order.

**ANALYSIS**

AgraKey says there are two reasons why Mid-Continent was obligated to defend it in the BioMagic arbitration:  First, BioMagic potentially alleged "disparagement," which is covered by the policy," by pursuing AgraKey for unfair competition and intentional interference with prospective business relationships.  Second, BioMagic potentially alleged an "advertising injury," and the policy covers "the use of another's advertising idea in your advertisement."  *See Motion Memo.*, at 1-2.

 The Court disagrees on both counts.  BioMagic did not allege disparagement or advertising injury.[3]  Before delving into these issues, however, the Court will address a threshold issue.

**A.      Consideration of the Motion for Injunctive Relief**

Mid-Continent argues that in determining whether BioMagic alleged any injury that might be covered under the policy, the Court must confine its review to the arbitration demand.  More to the point, Mid-Continent contends that the Court cannot consider the later-filed motion for injunctive relief.

Mid-Continent relies principally on *Construction Management Systems, Inc. v. Assurance Co.*, 23 P.3d 142 (Idaho 2001) to support this argument.  But that case did not directly address whether courts should exclude later-filed briefing in determining coverage.  It simply reiterated hornbook law – namely, that the complaint will be broadly construed in determining coverage.  *Id.* at 144-45.

---

[3] Given these rulings, which are explained below, the Court need not address the parties' remaining contentions.

Idaho courts have not directly ruled on the more precise issue of whether later-filed briefing should be excluded.  Nonetheless, in *Hirst v. St. Paul Fire & Marine Insurance Co.*, 683 P.2d 440 (Idaho 1984), the Idaho Supreme Court observed that while the "allegations in the plaintiff's complaint frame an insurer's duty to defend, those pleadings are not to be read narrowly.  Rather a court must look at the full breadth of the plaintiff's claim." *Id.* at 446.  Continuing in that that vein, the *Hirst* Court observed that a defendant insurance company "'cannot construct the formal fortress of the third-party's pleadings and retreat behind its walls.  The pleadings are malleable, changeable and amendable . . . [C]ourts do not examine only the pleaded word but the potential liability created by the suit.'" *Id.* (quoting *Standard Oil Co. of Cal. v. Haw. Ins. & Guar. Co.,* 634 P.2d 123, 129 (Haw. Ct. App. 1981)).

With this observation in mind, it would be odd to hold that courts are duty-bound to consider potential theories in a complaint, but then ignore any potentiality that has actually occurred.  Here, AgraKey did not tender the BioMagic arbitration for coverage until *after* the motion for injunctive relief was filed.  This delayed notice may create issues in terms of AgraKey's obligation to timely tender,[4] but it does not logically mean that the insurance company can – at that point – create a fortress by focusing solely on the arbitration demand itself and ignoring the manner in which the arbitration actually developed.  So in determining whether there is coverage, the Court will consider the motion for injunctive relief as well as the arbitration demand.

---

[4] The parties dispute whether AgraKey timely tendered the BioMagic action, but the Court does not need to reach that issue to resolve this motion.

**B.      Disparagement**

The first substantive issue is whether BioMagic potentially alleged "disparagement" in the arbitration.  The parties do not dispute that the policy, by its terms, covers "disparagement."  *See Ins. Contract,* Dkt. 1-1, at 13-14 (defining covered personal and advertising injury to include injury "arising out of" various enumerated offenses, including disparagement).  They dispute whether BioMagic was pursuing AgraKey for disparagement.

Disparagement of the quality of goods is a form of injurious falsehood, and is commonly called trade libel or product disparagement.  *See generally* Restatement (Second) of Torts § 626, cmt. a.  To state a product disparagement claim, the underlying plaintiff (BioMagic) must allege that the defendant (AgraKey) made false, injurious, or derogatory statements about BioMagic's products in an effort to influence potential purchasers not to buy BioMagic's products.  *See generally id.* § 623A; *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988) (applying California law).

BioMagic does not allege that AgraKey specifically mentioned BioMagic in any oral or written publication.  Instead, AgraKey relies on a disparagement-by-implication theory generally based on BioMagic's allegations that AgraKey wrongly represented it had the proprietary rights to BioMagic's product.  More specifically, AgraKey points to the following assertions BioMagic made in the arbitration proceedings:

First, in its motion for injunctive relief, BioMagic argued that "AgraKey's continued unauthorized sale of the Licensed Product is creating confusion in the marketplace as to who actually owns the proprietary rights of the BioMagic Products" *See Sep Stmt.*, Dkt. 21 ¶ 8.

Second, in a declaration supporting BioMagic's motion for injunctive relief, a BioMagic representative stated that:

> the continued unauthorized manufacture, marketing and sale of this product is causing general damages to BioMagic's business reputation and goodwill, by, among other things, creating confusion in the marketplace as to who owns the rights to this proprietary product and the general reluctance of customers to do business with BioMagic *given AgraKey's representations that it owns the rights to this proprietary product.*"

*Sep. Stmt.,* Dkt. 21 ¶ 10 (quoting declaration filed in the arbitration proceedings).

Under AgraKey's theory, these representations implicated BioMagic's products – even though AgraKey did not specifically mention BioMagic or its products.

AgraKey has not cited any Idaho authority regarding disparagement by implication. Nonetheless, this Court predicts that Idaho courts would recognize such a theory if the publication at issue clearly implicated the plaintiff or its products. *See, e.g., E.Piphany, Inc. v. St. Paul Fire & Marine Ins. Co.*, 590 F. Supp. 2d 1244, 1253 (N.D. Cal. 2008) ("Taken together, these allegations show a claim for disparagement by 'clear implication.'") (applying California law, citations omitted). As one court explained, "common sense suggests that a product may be disparaged by a publication in which the identity of the product, while not expressly mentioned, is clearly implied." *Tosoh Set v. Hartford Fire Ins. Co.*, 2007 WL 1242172, at *7 (Cal. Ct. App. 2007) (unpublished

decision) (concluding that the statement at issue was disparaging to defendant's products and services "by clear implication").[5]

But the problem here is that BioMagic did not allege (or potentially allege) that AgraKey disparaged BioMagic or its products – either expressly or impliedly. Rather, BioMagic alleged that AgraKey (1) wrongly sold the product called "UNLOK" in breach of the parties' contract, and (2) wrongly represented that it had the "proprietary rights" to UNLOK. This does not clearly imply anything about BioMagic or its products. Further, BioMagic did not allege that AgraKey said it had the *exclusive* rights to sell UNLOK. That might get AgraKey closer because then there is, arguably, an implication that anyone else who sells UNLOK is doing so wrongfully. *Cf. Liberty Mutual v. OSI Industries, Inc.*, 831 N.E. 2d 192 (Ct. App. Ind. 2005) (defendant claimed "absolute ownership" in the products and technology at issue).

The Court finds *Parkham Industrial Distributors, Inc. v. Cincinnati Insurance Co.*, 2008 WL 451023 (W.D. Ky. 2008) persuasive. In that case, the court held a company did not "disparage" another's product by wrongly saying that it had the proprietary rights to a particular technology. *Id.* at *5. As the court explained:

> We find that IRST's argument reaches beyond a reasonable reading of the ordinary definition of 'disparagement;' and thus is without merit. Additionally, there is no allegation that SPI or SPI products were identified in IRST's advertisement, making the connection to SPI tenuous at best. . . . IRST is not alleged to have said anything negative about SPI's products; only that it held the proprietary rights in the technology.

---

[5] The Court is not persuaded – and predicts that the Idaho courts would not be persuaded – by cases arguably suggesting a lesser standard. *See Plaintiff's Reply,* Dkt. 47, at 4-5.

*Id.*

Finally, plaintiff's reliance on *Yousuf v. Cohlmia*, 718 F. Supp. 2d 1279 (N.D. Okla. 2010) is misplaced.  *See Mot. Memo.*, Dkt. 20, at 9.  There, the court recognized that "certain claims for intentional interference with contract or business relations will trigger coverage under insurance policies that cover "the offense" of "the publication . . . of other defamatory or disparaging material."  *Id.*  But *Yousuf* itself – as well as the cases it relied upon – involved a disparaging publication.   In *Yousuf*, the plaintiff in the underlying action alleged that Yousuf (the insured) made false statements to the news media that disparaged plaintiff's reputation.  718 F. Supp. 2d at 1282.  *See also Bankwest v. Fidelity & Deposit Co. of Md.*, 63 F.3d 974, 980 (19th Cir. 1995) ("the Houses' claim for intentional interference with contract does allege that Bankwest interfered with their contractual and business relations by publishing such false statements"); *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 171 (Mo. 1999) (en banc) ("There can be no serious question that the statements alleged in the lawsuit disparaged Bennett's services as a security guard.").  In such a context, it makes sense to find coverage for the interference with business relations – they involved disparaging publications.  Here, as already noted, there is no disparaging publication – either express or implied.  The Court therefore concludes that Mid-Continent was not obligated to provide a defense based on the "disparagement" clause in the insurance policy.

## C.     Advertising Injury

Next, AgraKey argues that Mid-Continent was obligated to defend it in the BioMagic arbitration because BioMagic alleged an "advertising injury."  The policy

provides coverage for personal and advertising injury, and defines advertising injury to include the "use of another's advertising ideas in your advertisement.'" *Ins. Policy*, Dkt.1-1, at 5, 13-14.

There are at least two problems with AgraKey's advertising-injury argument.

*First*, even reading the arbitration demand (and the injunctive relief papers) broadly, BioMagic did not potentially allege that AgraKey used BioMagic's advertising idea in its advertisements.  AgraKey insists otherwise, pointing to Gary Mobley's declaration, which supported BioMagic's motion for injunctive relief.  But Mobley did not state that AgraKey had used one of BioMagic's advertising ideas.

Mobley discussed AgraKey's website in an effort to show that AgraKey was wrongfully selling the very product that was supposed to be sold (according to BioMagic) under the terms of the license agreement.  To prove that point, Mobley pointed out that AgraKey's website includes testimonials from customers who said they had been using AgraKey's product for two or three years.  As Mobley explained, "Two to three years ago is 2007-08, when Respondents were manufacturing and selling the Licensed Product under the name UNLOK product under the terms of the License Agreement and paying BioMagic royalties. *See Mobley Aff.* (quoted in Plaintiff's Motion Memo., Dkt. 20, at 15-16).  Mobley also stated that AgraKey's website indicated its product had been the subject of university research and field trials during the same time AgraKey had sold UNLOK under the terms of the license agreement.  *See id.* ¶ 14.  Again, however, the point of Mobley's statements was to demonstrate that the product AgraKey was selling was the product it had been selling under the license agreement.  As Mobley explained,

"Taken together, these representations in the Research Tab of its website that UNLOK has been the subject of successful university studies and field trials between 2005-08 *is an admission that the UNLOK product Respondents continue to sell today is the same Licensed Product that they were manufacturing and selling under the terms of the License Agreement*." *Id.* (emphasis added).

Under these circumstances, the Court rejects the argument that BioMagic was alleging that AgraKey used BioMagic's "advertising ideas," such as "customer testimonials" and "research and university studies." *Mot. Memo.*, Dkt. 20, at 8.

The Court is also not persuaded by AgraKey's citation to *Bank of the West v. Superior Court*, 833 P.2d 545 (Cal. 1992). Relying on this case, AgraKey suggests that BioMagic need only allege a "passing off" claim in order to trigger coverage for the "use of an advertising idea." *See Reply¸* Dkt. 20, at 15 ("if AgraKey's use of UNLOK constitutes unfair competition in the form of 'passing off' as alleged by BioMagic, BioMagic's UNLOK is within the meaning of the phrase 'use of . . . [an] advertising idea.'").

*Bank of the West* is distinguishable. In that case, the California Supreme Court addressed whether an insurance policy that covered "advertising injury" caused by "unfair competition" extended to both common-law unfair competition claims as well as statutory unfair competition claims. *See* 833 P.2d at 551. The court did not directly discuss whether policies such as this one – which cover advertising injury caused by the offense of "using another's advertising idea in your advertisement" – should be construed to cover advertising injuries caused by unfair competition.

The *second* problem with AgraKey's advertising injury theory is that BioMagic did not allege that the "advertising" at issue caused BioMagic's alleged injuries.  In *Construction Management Systems, Inc. v. Assurance Co.*, 23 P.3d 142, 145-46 (Idaho 2001), the Idaho Supreme Court held that there must be a causal connection between the advertising activity and the injury alleged in the underlying complaint.  *See also, e.g., Simply Fresh Fruit, Inc. v. Continental ins. Co.*, 94 F.2d 1219 (9th Cir. 1996) (applying California law; determining that there must be a causal connection between the injury alleged in the underlying complaint and the insured's advertising activity).

In *Construction Management Systems*, Woodside Homes sued Construction Management Systems (CMS) for copyright infringement after CMS allegedly built homes based on Woodside's copyrighted architectural plans.  *Id.* at 144.  CMS argued that if the Woodside complaint was broadly read, there was a sufficient connection between the copyright infringement claim and CMS's advertising activities.  More specifically, CMS contended that building the homes, placing them on the market, and having real estate brokers promote them gave rise to a potential that the copyright infringement activities were related to or connected with advertising.  The court squarely rejected this argument, explaining that "[b]ecause Woodside's claim of infringement, even when read broadly, is based on the construction of the homes, rather than their advertisement, we hold that Assurance did not have a duty to defend CMS in the copyright litigation."  *Id.* at 145.

The same logic applies here.  BioMagic's claim was based on AgraKey's continued sale of a product – not on AgraKey's advertisement of that product. Thus, Mid-Content did not have a duty to defense for any alleged advertising injury.

AgraKey argues that a different result is warranted here because its policy language differs from the *Construction Management* policy.  But there is not any meaningful distinction.  Under both policies, the advertising injury must arise out of – or be caused by – the advertising.  The policies just state that requirement differently.

The *Construction Management* policy covered, among other things, "'Advertising injury" caused by an offense committed in the course of advertising your goods, products or services . . . ."  23 P.3d at 144 (emphasis added).[6]  Mid-Continent's policy applies to "'personal and advertising injury' caused by an offense arising out of your business . . ." and defines "personal and advertising injury" to mean injuries "arising out of" one or more enumerated offenses, including the "use of another's advertising idea in your "advertisement."  *Ins. Policy*, Dkt. 1-1, at 11-12.

---

[6]The more complete policy terms in *Construction Management* are as follows:

COVERAGE B - Personal and Advertising Injury Liability

1.  Insuring Agreement.

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies.

    b.  This insurance applies to:
        . . .
        (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services . . . .

23 P.3d. at 143-44.  Another section of the policy defined advertising injury as follows:

    1. "Advertising injury" means injury arising out of one or more of the following offenses:
        . . . .
        (d) Infringement of copyright, title, or slogan.

*Id.* at 144.

AgraKey insists that there is a substantive difference in these policies by ignoring the latter portion of the Mid-Continent provision just quoted (the part that defines advertising injury as one that arises out of the insured's use of another's advertising idea in its advertisement) and, instead, placing these two provisions side by side:

(1)     The *Construction Management* provision stating:  "This insurance applies to: . . . [¶] 'Advertising injury' caused by an offense *committed in the course of advertising your goods, products or services......*"

(2)     The Mid-Continent provision stating:  "This insurance applies to 'personal and advertising injury' caused by an offense *arising out of your business . . . .*"

By focusing solely on the Mid-Continent phrase "arising out of your business" – and comparing that to the narrower, *Construction Management* phrase "committed in the course of advertising" – AgraKey concludes that Mid-Continent's policy only requires that the offense arise out of the insured's business.  *See* Reply, Dkt. 47, at 4.

AgraKey's causation analysis – and its comparison of the insurance contracts – is contrived.  Of course the advertising injury must be caused by an offense arising out of AgraKey's business.  But that does not mean that *any* personal or advertising injury is covered.  Rather, the policy's definition of "personal or advertising injury" must also be satisfied.  And – as already discussed – the definition of "personal and advertising injury" provides that the injury must arise out of one or more of the listed offenses.

So, reading the Mid-Continent policy as a whole leads to the following conclusions:  (1)  the insurance applies to advertising injury; (2) the advertising injury must "arise out of" the use of another's advertising idea in AgraKey's advertisement; and (3) that particular offense – using another's advertising idea in the insured's

advertisement – must, in turn, arise out of AgraKey's business. The causation requirement thus still applies.

Notably, AgraKey has not cited any authority supporting its causation argument, and other district courts have rejected similar arguments. *See Feldman Law Group P.C. v. Liberty Mut. Ins. Co.,* --- F. Supp. 2d ---, 2011 WL 2610642, at *6 (S.D.N.Y. June 30, 2011) (under substantially similar policy language;[7] the court observed that the policy "clearly stated that only allegations of injury directly caused by the advertisement would be covered"); *Everest Indem. Ins. Co. v. Allied Int'l Emergency LLC*, 2009 WL 2030421, at *6-7 (N.D. Tex. 2009).

In sum, BioMagic did not allege that AgraKey used BioMagic's advertising idea nor did it allege that AgraKey's advertising caused BioMagic to sustain any advertising injury. AgraKey is therefore not entitled to summary judgment.

**D.     Summary Judgment in Mid-Continent's Favor**

Mid-Continent, on the other hand, is entitled to summary judgment. Mid-Continent did not cross-move for summary judgment, but the Court finds that there are no disputed issues of material facts and, further, Mid-Continent is entitled to summary judgment. Because Agra-Key had a full opportunity to ventilate the relevant facts and issue, the Court will grant summary judgment in Mid-Continent's favor. *See* Fed. R. Civ. P. 56(f); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982).

---

[7] The relevant policy language is set forth at pages 3 and 4 of the policy, which can be found in the *Feldman* district court docket at Entry No. 6-3. *See Feldman*, Case No. 11-civ-425(SAS) (S.D.N.Y.).

**ORDER**

Plaintiffs' Motion for Summary Judgment (Dkt. 19) is **DENIED.**  The Court

instead grants summary judgment in favor of defendant, Mid-Continent Casualty

Company.

DATED:  **March 14, 2012**

Honorable Edward J. Lodge
U. S. District Judge